258 P.2d 391

MIDDLE RIO GRANDE WATER USERS ASS'N v. MIDDLE RIO GRANDE CONSERVANCY DIST.

No. 5544.

Supreme Court of New Mexico.

May 11, 1953.

On Application for Approval of Amendatory Contract June 29, 1953.

A. T. Hannett, G. W. Hannett and W. S. Lindamood, Albuquerque, for appellant.

Martin A. Threet and D. A. Macpherson, Jr., Albuquerque, for appellee.

McGHEE, Justice.

This is an appeal from a decree holding legal a contract entered into by the United States of America and the Middle Rio Grande Conservancy District.

The appellant's statement of the case so clearly presents the issues raised below and the action of the court there that we will first copy it and then dispose of the legal questions under the points urged by them. We quote:

"The Board of Trustees of Middle Rio Grande Conservancy District, hereinafter referred to as appellee, initiated this proceeding by filing a petition for the purpose of determining the validity of a Reclamation Contract, executed September 24, 1951, between the United States of America and appellee, the Middle Rio Grande Conservancy District, alleging that on the 24th of September, 1951, appellee had entered into a contract with the United States of America under and pursuant to the provisions of Chapter 148, 1939 New Mexico Session Laws, as amended, embraced in Article 31 of Chapter 77 of New Mexico Statutes Annotated, 1941, as amended, attaching to its petition a copy of the proposed contract. Appellee asked the three-judge Conservancy Court, provided for in Section 77–3120, New Mexico Statutes Annotated, 1941, to adjudicate said contract in all respects valid. The petition sets forth that by the terms of the contract the United States agrees within the limitation of the contract and to the extent funds are available to acquire through said Conservancy District at prices satisfactory to the Secretary of the Department of Interior of the United States, or his duly authorized represenative, the outstanding bonds evidencing the present bonded obligation of appellee; to rehabilitate and extend the irrigation and drainage system of appellee, including El Vado Dam and reservoir; also that before undertaking any such rehabilitation work, the United States shall submit its program and plan therefor annually in advance to appellee for consultation and advice; to . rectify the channel of the Rio Grande in the Middle Rio Grande Valley, including Espanola Valley and the

Hot Springs area; also dredging from near the south boundary of appellee into the Elephant Butte Reservoir; provided that the features of the project above designated and their order of construction may be varied, and as thus varied, constructed in the order, all as determined by the Secretary of the Interior or his duly authorized representative.

"That under the terms of said contract, among other things, appellee's obligation for the works and benefits to be performed by the United States of America is to reimburse the United States of America to the maximum of $18,000,000 payable over a period of forty years without interest.

"Appellee also alleges on information and belief that it would be and is for the best interests of the landowners, farmers, and water users within the appellee's boundaries that this contract be approved and confirmed in all respects by the Conservancy Court * * *.

"In response to said petition the Court made its order setting the matter for hearing, after due notice, on the 13th of December, 1951.

"On the 12th of December, 1951, the Middle Rio Grande Water Users Association, hereinafter referred to as appellant, comprised of some 324 water users engaged in the cultivation of soil within the boundaries of appellee, in its own behalf and in behalf of others similarly situated, filed its demurrer and answer, by which appellant challenged the sufficiency of the petition for the following reasons:

"A. That the contract lacked mutuality in that it obligates the appellee to the performance of many and divers obligations without any firm obligation on the part of the United States.

"B. That Sections 77–3102, 77–3112, 77–3113, 77–3114, New Mexico Statutes Annotated, 1941, which sections are an integral part of Chapter 148, Laws of 1939, under which Act appellee claims the authority to enter into said contract, are unconstitutional and void in that said sections offend against and were passed in defiance of Sections 1, 2, 3, of Article 16 of the Constitution of the State of New Mexico for the reason that under the terms of said contract the long-established water rights under the doctrine of prior appropriation of water placed to beneficial use are ignored and, if said contract is made, executed, delivered, and enforced according to its terms, the ancient water rights of the appellant and others similarly situated will be lost to them; that said contract will deprive the owners of ancient water

rights guaranteed under said sections of the Constitution of all their vested rights to the use of the waters of the Rio Grande.

"C. That said sections offend against and are violative of Section 18, Article 4 of the Constitution of the State of New Mexico in that said statutes attempt to extend by reference to its title only the Reclamation Act passed by the Congress of the United States (43 U.S.C.A. Secs. 371–670), together with any rules and regulations that have been or may hereafter be promulgated by the Secretary of the Interior thereunder in such a manner as to constitute blind legislation ·and divest appellant of substantive rights, and further the appellant's authority to enter into said contract, as appellant is informed and believes, is based on powers granted by the terms of Chapter 148 of the Laws of 1939, of which said sections are an integral part.

"D. .That said contract offends against and is contrary to the fundamental constitutional principle that the legislative, executive, and judicial branches of the government shall be separate and independent, and that none of the said departments of government shall invade the powers or duties of any other departments in that said contract and said legislation strips the courts of the State of New Mexico of jurisdiction to settle disputes as to water rights and as to any right under said contract, and purports to vest such jurisdiction in the executive branch of the government, to-wit, the Secretary of the Interior.

"E. That said contract and legislation under which appellee purports to act offends against the Tenth Amendment to the Constitution of the United States in that appellant is a public corporation vested with governmental function, including the power to tax and levy assessments, and that the appellee is now trustee of the irrigable waters of the Rio Grande in the District for the purpose of distributing the same to the owners of water rights and has no title to the water; that the title to the water is appurtenant to the land and belongs to the landowners, and said contract attempts to transfer title to the water of. the river and the taxing power of the appellee to an executive of the federal government, to-wit, the Secretary of the Interior.

"F. That said contract and the legislation under which appellee purports to act in entering into said contract violates the Fifth and Fourteenth Amendments of the Constitution of the United States and Article 2, Sections 4 and 18 of the Constitution of

the State of New Mexico, in that it deprives the appellant of the liberty of contract.

"G. That said contract will convey to the United States all rights-of-way, ditches, canals, and diversion dams which are held in trust by appellee for the use and benefit of appellant and others similarily situated against the will and without the consent of the appellant.

"H. That said contract and said statute under which appellee claims the authority to enter into the same offends the due process and equal protection and contract clauses of the United States Constitution, and is therefore void because it attempts to change the contract now made and existing between the individual landowners and the appellee by changing the number and amount of the unpaid installments and extending the time for the payment thereof over a period of forty years without the consent of the landowners.

"By the terms of appellant's answer appellant denies the allegations set forth in paragraph 4 of appellee's petition and affirmatively alleges that all of the alleged agreements on the part of the United States, by the terms of said contract, are subject to the vicissitudes of Congressional appropriations, and in event of failure on the part of the United States to make such appropriations neither the appellee nor the water users would have a remedy.

"Appellant in its answer denied the allegations set forth in paragraph 6 of the petition which alleges in effect, upon information and belief, that it would be for the best interests of the landowners, farmers, and water users that the contract be in all respects approved and confirmed.

"After hearing, the Court rendered a memorandum opinion finding the issues against the appellant and in favor of appellee. Thereafter, the appellee and appellant filed requested findings of fact and conclusions of law. The Court then made and entered its own findings and conclusions, and judgment was entered thereon in favor of appellee and against appellant, upholding the validity of the contract and the Acts heretofore described from which judgment the appellant has brought this appeal."

As there is no question but that a large number of landowners within the District belong to the appellant association and oppose the contract, and as the material facts are undisputed, we feel the attacks on the legality of the contract may be answered by taking up the legal matters raised, first determining the jurisdiction of the trial

court in passing upon the legality and validity of the contract, and, in turn, our jurisdiction in passing upon the appeal.

■ We agree with the contention of the appellee that this is a special proceeding, and the lower court was limited in its jurisdiction in passing upon the contract to a determination of whether the applicable statute, art. 31, secs. 77–3101 through 77–3124, N.M.S.A., 1941 Comp., authorizes the appellee to enter into the contract as written; whether the appellee abused its discretion in so doing; and whether such statute is constitutional and valid. Our review is limited by the same yardstick.

The Act of Congress of May 15, 1922, 42 Stat. 541, granting authority to the Secretary of the Interior to enter into contracts with existing irrigation districts provides:

"* * * That no contract with an irrigation district under this Act shall be binding on the United States until the proceedings on the part of the district * * * shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid." 43 U.S.C.A. § 511.

Section 77–3120, 1941 Comp., so limits the jurisdiction of the Conservancy Court. See also American Falls Reservoir Dist. v. Thrall, 1924, 39 Idaho 105, 228 P. 236.

Point one relates to the duty of the Conservancy Court to pass upon certain requested findings of fact and conclusions of law which we do not deem it necessary to discuss in disposing of the appeal.

■ Point two of the appellant reads:

"That the Contract Here Sought to be Declared Valid Lacks Mutuality in that the United States is not Bound to do or Perform any Act to Carry Out the Terms of Said Contract Other Than to Take Possession, at Its Discretion, of the Property of the District and Operate it in Whole or in Part in Its Discretion Unless and Until the Congress of the United States Appropriates or Makes Available Funds for the United States to Carry Out the Improvements Mentioned and Described in Said Contract, and the District is Obligated Without any Consideration to Transfer All of Its Property and the Management Thereof to the United States. Further Said Contract cannot be Specifically Enforced by Either the District or Any Water Users, but might be Specifically Enforced by the United States."

It is true performance on the part of the United States is conditioned upon appropriations being made by the Congress to carry out the rehabilitation of the ditches and works of the District, but this is true

of all government contracts. The contract provides:

"9. To the extent funds are, and may be made available therefor, the United States will within the limitations of this contract construct the Project comprising the following features:

"(a) Acquire through the District at prices satisfactory to the Contracting Officer, the outstanding bonds, evidencing the present bonded obligation of the District.

"(b) Rehabilitate and extend the irrigation and drainage system of the District including the El Vado Dam and Reservoir. Before undertaking any such rehabilitation work, the United States shall submit its program and plan therefor annually in advance thereof to the District for consultation and advice.

"(c) Rectify the channel of the Rio Grande in the Middle Rio Grande Valley, including the Espanola Valley and the Hot Springs area; also dredging from near the south boundary of the District into the Elephant Butte Reservoir. Provided, that the features of the project above designated and their order of construction may be varied, and as thus varied, constructed in the order, all as determined by the contracting officer.

\* \* \* \* \* \*

"12. At the termination of construction as determined by the Contracting Officer, as in Article 11 hereof provided, he shall give the District notice thereof which shall set forth (1) the actual costs of constructing features of the project described in subparagraphs (a) and (b) of Article 9; (2) the amount of such costs to be repaid by the District; (3) the credits to the District for payment to the United States of the net proceeds from collection of assessments during the construction period as provided in Article 10 hereof, and the balance thereof shall be payable by the District to the United States in forty (40) consecutive annual installments, each of which may be paid one-half thereof on February 1 and the other on August 1 of each year commencing with the year succeeding that in which such construction cost notice is given, if given prior to September 1; otherwise commencing with the second year succeeding that in which such notice is given.

"Provided that if a final determination of such costs and of the District's obligation hereunder cannot be made at the time such notice is given, said notice shall contain an estimate of such obligation, which shall determine the amount of installments payable by the District until such time as the actual obligation of the District can be deter-

mined and notice of such determination is given to the District, at which time any difference between the estimated and actual obligation of the District shall be spread equally as a charge or credit as the case may require over the installments maturing following the issuance of such construction cost notice."

The United States agrees to do three things:

1. To acquire and cancel the outstanding bonds of the district.

2. To rehabilitate and extend the irrigation and drainage system.

3. To rectify the Rio Grande channel, including that portion near the head of Elephant Butte Lake where so much water has lately been wasted.

The District agrees to repay the reimbursable cost of such works over a period of forty years without interest. The United States will not take over until the money is available to begin the operation. The contract contemplates performance by the United States will take many years, and it is unreasonable to require the full appropriations to be made and the money impounded in the treasury over such period of time.

The appellant says the contract contemplates dual control which is prohibited by Middle Rio . Grande Conservancy Dist. v. Chavez, 1940, 44 N.M. 240, 101 P.2d 190.

The United States will not take over the operations until the contract is judicially approved and the money is available, when under the plan adopted the District will have its duties in making and collecting assessments, and the United States will be in charge of operation and construction. Such is the plan generally followed in the operation of reclamation projects, and we see nothing impractical or illegal in such plan.

The matters raised under point two must be ruled against the appellant.

The third point raised by the appellant reads:

"The Court Erred in Refusing Appellant's Conclusion of Law No. 2 Which Reads:

"That Sections 77–3102, 77–3112, 77–3113, 77–3114, New Mexico Statutes Annotated, 1941, Which Sections are an Integral Part of Chapter 148, Laws of 1939, Under Which Act the Plaintiff Claims the Authority to Enter Into Said Contract, are Unconstitutional and Void in that Said Sections Offend Against and were Passed in Defiance of Sections 1, 2, 3, of Article 16 of the Constitution of the State of New Mexico for the Following Reasons:

"(a) That Under the Terms of Said Contract the Long-Established Water Rights Under the Doctrine of Prior Appropriation of Water Placed to Ben-

eficial Use are Ignored and if Said Contract is Made, Executed, Delivered, and Enforced According to Its Terms, the Ancient Water Rights of Water Users, the Defendants and Others Similarly Situated Will be Lost to Them.

"(b) That the Owners of Ancient Water Rights Guaranteed Under Said Sections of the Constitution Will Be Deprived of Their Vested Rights to the use of the Waters of the Rio Grande, the Distribution of Said Waters Being Entirely Left to the Discretion, Whim, and Caprice of the Secretary of the Interior, Acting Through the Reclamation Bureau.

"(c) Further that Sections 77-3102, 77-3112, 77-3113, and 77-3114, New Mexico Statutes Annotated, 1941, Offend Against and are Violative of Section 18, Article 4 of the Constitution of the State of New Mexico in That Said Statutes Attempt To Extend By Reference to Its Title Only the Reclamation Act Passed by the Congress of the United States (43 U.S.C.A. Secs. 371-670), Together With Any Rules and Regulations That Have Been or May Hereafter Be Promulgated by the Secretary of the Interior Thereunder in Such a Manner as to Constitute Blind Legislation and Divest Petitioners of Substantive Rights, and Further the Plaintiff's Authority to Enter into said Contract is Based on Alleged Powers

Granted by the Terms of Chapter 148 of the Laws of 1939 of Which Said Sections are an Integral Part."

The substance of the statutes mentioned reads:

The District * * *

(a) may convey to the United States land or water rights or any interest therein, either without monetary consideration therefor or in partial consideration of the privileges derived from a reclamation contract or for other consideration;

(b) may, and if so agreed in a reclamation contract shall, withhold water from lands which under the terms of the Reclamation Law (43 U.S.C. Secs. 371-611), a reclamation contract, or rules and regulations thereunder are not entitled to receive water, and from water users or the lands of water users delinquent in the payment of any assessment, toll, rental or other charge, but this remedy shall be in addition to all other remedies available for the enforcement of the reclamation contract or collection of assessments, tolls, rentals or other charges, and

(c) may accept the provisions of any existing or future act of Congress applicable to such district.

The Constitution provisions named read:
Article 16:

"§ 1. All existing rights to the use of any waters in this state for any use-

ful or beneficial purpose are hereby recognized and confirmed."

"§ 2. The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right."

"§ 3. Beneficial use shall be the basis, the measure and the limit of the right to the use of water."
Article 4:

"§ 18. No law shall be revised or amended, or the provisions thereof extended by reference to its title only; but each section thereof as revised, amended or extended shall be set out in full."

█ ·We will first consider the claim the adoption of the reclamation statutes by reference to the title of the Reclamation Act is violative of art. 4, Sec. 18, supra. If these reclamation statutes are a necessary part of the act in which they are adopted, it must be confessed they are void, for we are firmly committed to the doctrine that only procedural law may be adopted by reference. State v. Armstrong, 1924, 31 N.M. 220, 254, 243 P. 333, and Yeo v. Tweedy, 1930, 34 N.M. 611, 286 P. 970.

█ As we view these statutes adopted by reference they were mere surplusage in Chapter 148, Laws of 1939, under which the contract was made. The Secretary of the Interior was necessarily limited by the Reclamation Act, and regulations made thereunder, in making the contract with the District, and when the contract was entered into, these statutes became an integral part thereof, as was the case when the Village of Deming entered into a contract with a governmental agency for the purchase of surplus war material. Brown v. Village of Deming, 1952, 56 N.M. 302, 243 P.2d 609.

█ Unquestionably, the District does not have the authority to barter away the vested water rights of the landowners who have applied them to beneficial use. The waters are appurtenant to the land and the District stores and delivers them to the users. Murphy v. Kerr, D.C., 296 F. 536, affirmed, 8 Cir., 1925, 5 F.2d 908, 41 A.L.R. 1359; Ickes v. Fox, 1937, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525; Gutierrez v. Middle Rio Grande Conservancy Dist., 1929, 34 N.M. 346, 282 P. 1, 70 A.L.R. 1261. In the Gutierrez case this Court in answer to a claim under the Conservancy Act that a vested water right could be conveyed by the District, said such statute referred only to new filings or waters developed by the District. Such an argument is here made by the District, and it says the conveyance only applies to new filings and new waters

acquired by the United States, and we believe section 28 of the contract only conveys such waters. So viewed, that part of the contract is not invalid or illegal.

Clearly, the statute and that part of the contract allowing the Reclamation Service to withhold water from water users delinquent in their payments is valid and legal. Without such provision a few would pay the charges of their delinquent neighbors.

Section 29 of the contract provides for the conveyance of the works and property of the District to the United States, and this property, appellant says, is held by the District as trustee for the landowners. It is true this municipal corporation holds these properties in the final analysis for its members, but in the conveyance to the United States it is only conveying the legal title as security for the money to be spent for the benefit of the District for which charge is made. No one can doubt but that the Congress of the United States will authorize the reconveyance of all such property to the District if, as and when its debt is paid.

Section 77-2726, subparagraph 10, N.M. S.A., 1941 Comp., provides in part, the Board shall not permanently sell, lease, assign, permit, or otherwise part with the control by the District of the use of water thereof. This section was a part of ch. 45, sec. 316, Laws of 1927, and must bow to the 1939 Act giving the Board authority to convey such waters to the United States as we say for security. They are not permanently sold, but conveyed as security for the payment of the debts to accrue. We do not believe the case of Palmer v. City of Albuquerque, 1914, 19 N.M. 285, 142 P. 929, L.R.A.1915A, 1106, cited by the appellant on this question has any application to the case at bar.

We next consider the effect of sec. 77-3112, 1941 Comp., in connection with the 160-acre limitation in the Reclamation Act, and its specific acknowledgment and approval in another section of the contract. The section of the statute reads:

"Contracts made by contracting districts, or landowners within contracting districts, for the purpose of limiting and controlling the size of land holdings entitled to receive water and providing for the disposition of lands in excess of such holdings, and of providing the manner of application of proceeds in the case of sales of district lands, in conformance with the provisions of the Reclamation Law (43 U.S.C., §§ 371–611), are hereby authorized and declared to be in accordance with the public policy of this State."

Section 32 of the contract reads:

"The irrigation water supply furnished through the project works constructed or rehabilitated in pursuance of this contract shall be delivered in

accord with the excess land provisions of the Federal Reclamation laws and regulations of the Secretary promulgated thereunder; Provided, that nothing in such regulations shall interfere with any vested water right as provided in Section 8 of the Reclamation Act of June 17, 1902 (32 Stat. 388) [43 U.S. C.A. §§ 372, 383], and in Section 203 Title II, Flood Control Act of June 30, 1948 (62 Stat. 1171)."

The Reclamation Act, ch. 12, 43 U.S.C.A. § 371 et seq., as well as the Flood Control Act of 1948, 62 Stat. 1171, sec. 203 under topic "Rio Grande Basin", provides for the recognition of valid existing water rights, as does the 1939 Conservancy Act. In the same act, as well as in one place in the contract now being considered, the statement is made that existing vested or valid water rights are recognized, but of what avail is the title to such a water right if the owner who has more than a 160-acre right is not allowed to get water for more than 160 acres. True, if the owner was able to make a direct diversion from the river to his land he could still cultivate more than 160 acres, but with the system of diversion dams and ditches such would be an impossible task. The contract contemplates and provides for the complete overhaul and rehabilitation of all works of the District, and with a provision in the contract recognizing and approving the limitation of acreage, a protesting water user would, in our opinion, be met with a judgment of a court of competent jurisdiction validating such contract, and he would be powerless to overcome the decree. The right to sue the Secretary of the Interior for violation of vested water rights was recognized by the Supreme Court of the United States in Ickes v. Fox, supra, but such ruling has now been overruled in the later case of Larson v. Domestic & Foreign Corp., 1949, 337 U.S. 682, 69 S.Ct. 1457, 1467, 93 L.Ed. 1628, where the Supreme Court reviewed its former opinions on the right to sue a governmental official, and concluded it had allowed too many such suits. In the course of the opinion it was stated:

"* * * Since we must therefore resolve the conflict in doctrine [right to maintain suits against government officers] we adhere to the rule applied in the Goldberg case [Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191] and to the principle which has been frequently repeated by this Court, both before and after the Goltra case [Goltra v. Weeks, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074]: the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for a specific relief against the officer as an individual only if it is not within the officer's statutory powers or,

if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void." (Parenthetic matter supplied.)

If the Ickes case was not completely overruled by the Larson case, it was certainly severely limited as was stated in State of New Mexico v. Backer, 10 Cir., 1952, 199 F.2d 426, where the state was denied the right to maintain an action against the government agent in charge of Elephant Butte Dam who was running water out under a contract with the Elephant Butte Irrigation District. The action of the state was to protect the health of the people of the City of Truth or Consequences from an epidemic which it was claimed would follow the draining of the lake and the killing of a great quantity of fish which would be deposited in the Rio Grande in such city.

The attempt to limit the delivery of water to those having vested rights to more than sufficient to irrigate 160 acres is, in my opinion, clearly unconstitutional, although I freely admit the right of the United States to limit the use of new or additionally developed water to 160 acres. As the majority hold otherwise, my views on this point become my dissent on this point.

We do not regard the attack on Sec. 77–3113, 1941 Comp., as valid. In the operation of a large irrigation district those charged with the delivery of water must know the demand, and how often water must be available for the landowners. It is a matter of common knowledge in this irrigated country that certain crops require more water and more frequent irrigation than other crops, and with a fair knowledge of the amount of water available they will be able to handle the available supply with due regard to the needs and rights of all users. It does seem harsh and perhaps high handed to require approval of particular crops, but, after all, the United States is preparing to put a lot of money into the District, and we feel it may require the planting of such crops as are likely to yield sufficient return to enable the landowner to pay his obligations, and to prevent the planting of such a noxious crop as Johnson grass. Limitation of acreage of crops by the Congress, and the payment of subsidies thereon have become commonplace, the heretofore rugged and individualistic cattleman being the last to succumb and secure price supports, according to the announcement of the Secretary of Agriculture made March 23, 1953.

Appellant's point four reads:

"The Court Erred in Refusing Appellant's Conclusion of Law No. 3 Which Reads:

"That Said Contract, Together with Chapter 148 of the Session Laws of 1939 Offends Against and is Contrary

to the Fundamental Constitutional Principle that the Legislative, Executive, and Judicial Branches of the Government shall be Separate and Independent, and that None of Said Departments of Government Shall Invade the Powers or Duties of any Other Departments, and that Said Contract and Said Legislation Strip the Courts of the State of New Mexico of Jurisdiction to Settle Disputes as to Water Rights and as to any Right of These Defendants and Others Similarly Situated under Said Contract, and Purports to and Will, if Entered into, Vest Such Jurisdiction in the Executive Branch of the United States Government, To-Wit, the Secretary of the Interior."

Section 21 of the contract provides:

"Should any assessment or assessments required by the terms of this contract and levied against any tract of land or water user in the District be judicially determined to be irregular or void or the District or its officers be enjoined or restrained from making or collecting any assessment upon said land as provided for herein, then such tract or water user shall have no right to any of the benefits of this contract and no water made available through the works constructed or rehabilitated by the United States

hereunder shall be delivered to or for such tract of land or water user."

In the Arch Hurley Conservancy District case, 1948, 52 N.M. 34, 191 P.2d 338, attack was made on the contract because it was said the Secretary of the Interior had the final say as to assessments under the statutes. Mr. Justice Sadler answered this contention by showing that under the statute the Secretary could recommend the incorporation of lands within the district, and suggest the assessments to be made, but that the final say was in the members of the Conservancy Board and then the Conservancy Court, and on such basis the contract was sustained. Here, however, we have an express provision of the contract the Secretary may override the decision of the Conservancy Court, or any other court, and enforce his mandate whether legal or illegal, and regardless even of what the Supreme Court of the United States might say. In so doing he would be protected by a contract held valid by this court, and even though he ordered the District to assess for clearly illegal purposes, as was done in Ickes v. Fox, supra, the District would be helpless to protect itself, especially since the decision in the Larson case, supra. We agree that for money lawfully expended for the District, or operation and maintenance charges lawfully made, the Secretary could compel the District to make assessment; but this, under the statutes, must be made

by the Conservancy District following a hearing at which the water owner may have his day in court. We hold the provision of section 21 quoted above to be illegal.

■ Argued under point four is also the provision of the contract making the Secretary of Interior the final arbiter of disputed facts, which the appellant says is illegal. Such a provision was held valid in United States v. Moorman, 1949, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256, and it is almost universally upheld in building contracts. Ann. 54 A.L.R. 1255. In United States v. Wunderlich, 1951, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113, it was held that even though the decision might be arbitrary, capricious, and grossly erroneous, if made by the head of a government department under a contract saying his decision should be final and conclusive upon the parties to the contract, it could not be set aside by the courts, in the absence of fraudulent conduct, i. e., conscious wrongdoing with an intention to cheat or be dishonest.

A reading of the Wunderlich case in the Supreme Court and in the Court of Claims, 117 Ct.Cl. 92, should be enough to satisfy one such a provision is improvident, but it is not illegal.

Appellant's point five raises the question of the legality of the clause giving the Secretary of Interior the right to tax, saying such is a legislative function which may be delegated to a local agency, but not to the United States.

With that part of section 21 giving the Secretary the right to override the courts in the making of assessments held illegal, the appellant's contentions under this point become unfounded, as we will then have the situation as it existed in the Arch Hurley case (Hudson addition), where the board will consider the recommendations of the Secretary and then will make its recommendations to the Conservancy Court which will have the final decision after giving the landowner his day in court.

■ Under point six the appellant says the contract violates the Fifth and Fourteenth Amendments to the Constitution of the United States, and Article 2, sections 4 and 18 of the Constitution of New Mexico. The argument is the members of the appellant association are *compos mentis* and *sui juris,* and fully able to contract for themselves. We have no fault to find with this general statement, but it is too late in the day to urge the Conservancy District may not enter into a valid contract with the United States for the rehabilitation and improvement of the existing district organized many years ago for the purpose, among others, of cooperating with the United States in the irrigation and drainage of the lands. Organized and

existing as a municipal corporation, and finding its works deteriorating, with water becoming more scarce as the years go by, and unable to secure the large amount of necessary money elsewhere, the Legislature was acting within its powers when it enacted ch. 148, Laws of 1939, permitting the District to enter into a lawful contract with the United States for the improvement of the District and the increase of its water supply. The matters raised under this point must be ruled against the defendant.

The matters raised under point seven have been covered by what is stated under point three.

Point eight reads:

"The Court Erred in Refusing Appellant's Requested Conclusion of Law No. 8 for the Reason that it Offends the Due Process and Equal Protection Clause of the Constitution of the United States in that it Attempts to Change the Contract Now Made and Existing Between the Individual Landowners of the Appellee by Changing the Number and Amount of Unpaid Installments and Extending the Time for the Payment Thereof."

The appellant relies on the case of Durand v. Middle Rio Grande Conservancy Dist., 1941, 46 N.M. 138, 123 P.2d 389, to sustain this assignment, saying we there passed on this very question, and that the opinion supports the assignment.

A different question was before the Court in the Durand case. There we had before us the constitutionality of a relief act passed by the Legislature in 1940 to relieve the agricultural lands of the district not in a state of cultivation from the payment of any outstanding bonded indebtedness until July 1, 1955, Sp.Sess, ch. 1, Laws of 1940, except an annual assessment of 25 cents per acre for maintenance. After 1955 the Act provided that the deferred payments on uncultivated agricultural lands should be capitalized and the total thereof without interest, would be due and payable in annual installments of not to exceed fifteen, the first of which would be due in 1955.

This Court held the relief act unconstitutional which attempted to change the method of assessment while there was an outstanding obligation of the district without the consent of the landowner, as violative of the Contract Clause of the Federal Constitution.

Here the United States will pay off the present bonded indebtedness, amounting to some $7,000,000, and it will be included in the not to exceed $18,000,000 reimbursable costs (based on 1947 prices), without interest. A new method of assessment will be provided which will not, we believe, run counter to the decision in the

Durand case. Section 37 of the contract provides:

"* * * Provided, it is the intent and purpose of both parties to this Contract that the acquisition and cancellation by the United States of the outstanding bonds, evidencing the present bonded obligations of the District, as provided in Article 9(a) of this Contract, shall be accomplished at the earliest date possible in order that:

"(a) The present method of assessment under the Conservancy Act may be discarded and the more equitable method of assessment adopted, as provided herein under the terms of the Conservancy District Reclamation Contract Act and the Federal Reclamation Law.

"(b) Savings may be made to the District and the United States by elimination of interest payments on the outstanding bonds."

Under the dire circumstances in which the District finds itself, plagued by continual threats of floods, the river bed constantly rising until the drainage ditches are no longer effective, the water supply decreasing and the Elephant Butte Water District and the State of Texas at this very time attempting to take more of the scarce water, we do not look at the new assessments, if regularly made under the

supervision and control of the Conservancy Court, with too critical an eye.

The matters raised under points nine and ten are elsewhere disposed of adverse to the appellants.

The contract and ch. 148, Laws of 1939, are legal and valid, except for the objectionable part of section 21 of the contract set out supra. If the section is amended to conform with our views on the subject, the contract and statute will be held legal and valid in their entireties.

The appellant will recover the costs of this appeal.

It is so ordered.

SADLER, Chief Justice (concurring in part and dissenting in part).

The opinion proposed by Mr. Justice McGHEE for disposition of this appeal meets with my approval in the main, indeed, in all respects except as disagreement with it shall be pointed out in what is said hereinafter.

The first question resolved by him which brings about conflict in our views is the excess-land provision, sometimes called the 160-acre limitation. His discussion of it is initiated by quoting 1941 Comp., Sec. 77–3112, declaring the limitation to be in accord with the declared public policy of this state, followed by quoting Article 32 of the contract providing that the irriga-

tion water supply furnished through the project works constructed or rehabilitated under the contract should be delivered in conformity with the excess-land provisions of the Federal Reclamation laws and regulations of the Secretary promulgated thereunder and closing with the proviso:

"* * * Provided, that nothing in such regulations shall interfere with any vested water right as provided in Section 8 of the Reclamation Act of June 17, 1902 (32 Stat. 388), and in Section 203 Title II, Flood Control Act of June 30, 1948 (62 Stat. 1171)."

Now just what is the excess-land proviso, or 160-acre limitation, to be found in the contract over which division in the court has developed as disclosed by a statement of the views of Mr. Justice McGHEE on the subject in the opinion prepared by him? The controlling language on this phase of the contract is a portion of the Federal Reclamation law to be found in U.S.C.A., Title 43, as section 423e; authorizing the United States to enter into contracts in a form to be approved by the Secretary of the Interior with an irrigation district or districts organized under state law for the construction or rehabilitation of irrigation works; and providing for payment of the cost thereof by the districts during the time they are in control of the United States, in not more than forty years. It was to enable irrigation and conservancy districts in our state to take advantage of the spirit of cooperation reflected by legislation such as this enacted by the Congress that caused the New Mexico legislature to enact L.1939, c. 148, pursuant to which the contract before us was executed.

Section 423e is captioned in 43 U.S.C.A. as follows:

"Completion of new projects or new division; execution of contract with district as condition precedent to delivery of water; contents of contract; cooperation of States with United States; limitations on sale of land."

The portion of the section dealing with the excess-land, or 160-acre, limitation reads as follows:

"Prior to or in connection with the settlement and development of each of these projects, the Secretary of the Interior is authorized in his discretion to enter into agreement with the proper authorities of the State or States wherein * * * such State or States shall cooperate with the United States in promoting the settlement of the projects or divisions after completion and in the securing and selecting of settlers. *Such contract or contracts with irrigation districts hereinbefore referred to shall further provide that all irrigable land held in private ownership by any one owner in*

*excess of one hundred and sixty irrigable acres shall be appraised in a manner to be prescribed by the Secretary of the Interior and the sale prices thereof fixed by the Secretary on the basis of its actual bona fide value at the date of appraisal without reference to the proposed construction of the irrigation works; and that no such excess lands so held shall receive water from any project or division if the owners thereof shall refuse to execute valid recordable contracts for the sale of such lands under terms and conditions satisfactory to the Secretary of the Interior and at prices not to exceed those fixed by the Secretary of the Interior; * * *.*"* (Emphasis ours.)

We should not, without a thorough understanding of just what the excess acreage limitation does, strike it down as overriding constitutional barriers sought to be raised against it. It is not a confiscation of the water user's land. Even though he refuses to comply with the conditions imposed by the limitation, he is not denied water for the 160 acres within the limitation. The excess acreage limitation does not require that he sell excess land on the penalty of a denial of further government service. It merely limits him to 160 acres' irrigation of land held in beneficial ownership, or 320 acres held by husband and wife in beneficial ownership as joint or

community property. Water from unavoidable seepage or percolation is not forbidden "furnishing" of water under the contract. The owner has 10 years within which to make any sale of excess land at its fair bona fide value at date of appraisal in a manner prescribed by Secretary of Interior. The land will carry its fair market value as irrigated and as enhanced by any existing construction but must exclude any increment of value arising from the construction of the project about to be undertaken.

An article appearing in 38 Cal.Law.Rev. 603 (1950) contains some interesting observations on the so-called 160-acre limitation. Among other things, the article states:

"The so-called '160-acre limitation,' 'acreage limitation,' or 'excess-land limitation' has, since 1944, been one of the principal battle-grounds of the opponents and proponents of federal development of natural resources · in the Central Valley.

"All three terms are unhappy accidents of nomenclature, but they have become such casual and convenient symbols of verbal shorthand that any effort to encourage the employment of a more realistic identification, such as 'project water limitation,' would seem quixotic. They are unrealistic in that they seem to imply that the law has

said something about how much land one may *own*. The limitation neither legally nor factually is one on the ownership of land—it rather is one on the amount of the owned land which may *receive water from a federal reclamation project*. Nor does it go in any way, as is so often asserted, toward regulating what a land-owner does with whatever water supply he already may have.

"The acreage limitation provisions of the federal reclamation laws, are not new. The first such provision of general application appeared in Section 5 of the original Reclamation Act of 1902. The most recent enactment of general application is Section 46 of the Omnibus Adjustment Act of May 25, 1926. This particular federal statute is the one applicable to the Central Valley Project, and the inclusion of its requirements in water service and repayment contracts with irrigation districts in the Central Valley therefore is a mandate by the Congress, and not open to a bargaining process during contract negotiations."

It is interesting to note that although the excess acreage limitation, in one form or another, has been a part of the Federal Reclamation law for more than 50 years, not a single case in an appellate court can be cited holding it invalid, or subject to constitutional barriers invoked against it.

It has been involved to a greater or less extent in certain decisions of several western states and in one federal case coming to our attention. See Nampa & Meridian Irr. Dist. v. Petrie, 28 Idaho 227, 153 P. 425; Saylor v. Gray, 41 Ariz. 558, 20 P.2d 441, 444; Klamath County v. Colonial Realty Co., 139 Or. 311, 7 P.2d 976; In re Goshen Irr. Dist., 42 Wyo. 229, 293 P. 373; Shoshone Irr. Dist. v. Lincoln Land Co., D.C., 51 F.2d 128.

We should not lose sight of the fact in resolving the excess acreage limitation that the entire contract submitted for approval is underlaid by that vast reservoir of latent sovereignty known as the police power. That the contracting parties were not unmindful of this factor is reflected in language to be found in explanatory recitals contained in the contract, stating one of the prime objects of the project was "protection of lands within the District from the hazards of floods." Perhaps unconsciously, yet actually, nevertheless, and properly as well we think, Mr. Justice McGHEE was drawing upon this same police power when he wrote:

"It does seem harsh and perhaps high handed to require approval of particular crops, but, after all, the United States is preparing to put a lot of money into the District, and we feel it may require the planting of such crops as are likely to yield sufficient return to enable the land-

owner to pay his obligations, and to prevent the planting of such a noxious crop as Johnson grass."

And again, and correctly we think, when he spoke concerning new assessments in distinguishing Durand v. Middle Rio Grande Consv. District, 46 N.M. 138, 123 P.2d 389, as follows:

"Under the dire circumstances in which the District finds itself, plagued by continual threats of floods, the river bed constantly rising until the drainage ditches are no longer effective, the water supply decreasing and the Elephant Butte Water District and the State of Texas at this very time attempting to take more of the scarce water, we do not look at the new assessments, if regularly made under the supervision and control of the Conservancy Court, with too critical an eye."

In this connection two legal maxims, worn threadbare by time yet still functioning with as much vigor as ever with the added leaven of age, come to mind. They are:

"Salus populi est suprema lex", literally translated meaning—"The health of the people is the supreme law" but often translated as "The safety of the people is the supreme law;" and

"Sic utere tuo ut alienum non laedas," meaning "So use your own as not to injure another's property."

The power of the state and its political subdivisions to act in a great emergency to protect and safeguard the lives and health of the people can be measured only by the necessities. Cases, some of them from this court, recognizing this broad power may be cited. Green v. Town of Gallup, 46 N.M. 71, 120 P.2d 619; Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865; State v. Walker, 34 N.M. 405, 281 P. 481; Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568; Queenside Hills Realty Co. v. Saxl, 328 U.S. 80, 66 S.Ct. 850, 90 L.Ed. 1096. An interesting case is the very recent one by the United States Supreme Court in which recovery was sought for destruction of property by General MacArthur in his assault upon the city of Manila in recapturing it from the enemy in the late war with Japan. United States v. Caltex, Inc., 343 U.S. 955, 72 S.Ct. 1050, 96 L.Ed. 1355. It is common knowledge that through floods, silting and other conditions which the present improvement is designed to correct and prevent, irrigated lands within the valley have progressively decreased from colonial days to the present time until now they are only about half what they were at their peak.

If a huge conflagration were sweeping Albuquerque fanned by a strong wind, none would question the power of the city government, exercising a modicum of sovereignty, to destroy by blasting or otherwise a sufficient "fire break" to stop the spread of the flames and save the lives and property of those living beyond. In reality, the imminence of the hazard from floods is no less if the flood control involved in the present program is not carried forward to completion. We cannot forget San Marcial! Flood control constitutes an integral part of work under this contract. The danger to the wellbeing and welfare of the residents of the valley through diminution and abandonment through necessity of lands now being irrigated, is less in degree only, if the present program fails when viewed in a long range perspective.

Our former decisions in In re Arch Hurley Conservancy District, 52 N.M. 34, 191 P.2d 338, and Sperry v. Elephant Butte Irr. Dist., 33 N.M. 482, 270 P. 889, dealt with the Federal Reclamation law and the former as well with L.1939, c. 148, enacted to authorize irrigation districts to enter into contracts with the United States to secure the benefits under the Federal Reclamation law. There is nothing in either of those decisions which can be said to question the conclusion we reach on the 160-acre limitation. We do not think the acreage limitation is subject to the legal objections raised against it, or that it renders the contract bad. To the extent its enforcement may affect vested water rights, there appears no unreasonable or prohibited exercise of the police power exerted in behalf of the welfare of the people as a whole residing in the valley. In denying validity to this portion of the contract Mr. Justice McGHEE, in his opinion, inquires:

"In the same act, as well as in one place in the contract now being considered, the statement is made that existing vested or valid water rights are recognized, but of what avail is the title to such a water right if the owner who has more than a 160-acre right is not allowed to get water for more than 160 acres. True, if the owner was able to make a direct diversion from the river to his land he could still cultivate more than 160 acres, but with the system of diversion dams and ditches such would be an impossible task."

It is not out of place to suggest that the owner's ability to make a direct diversion from the river was long since lost by diversion dams and ditches already installed for many years by construction of the District which the present improvement merely seeks to rehabilitate and expand. Furthermore, if the present improvement be not carried to completion adequate water for

the 160 acres within the limitation, in so far as practical use goes, soon may be in the same situation with present ability to irrigate by direct diversion from the river.

When preparation of this opinion began it was my thought that it would record two points of disagreement with the opinion of Mr. Justice McGHEE. The first is the one just discussed, the excess acreage limitation; and the other is the portion of his opinion holding invalid that part of Article 21 empowering the Secretary of Interior to withhold water from a water user for failure to pay any assessment, even though its collection may have been enjoined or the assessment declared void by some court of competent jurisdiction. The provisions of the Federal Reclamation law and Flood Control Act of 1948 disclaiming any purpose to affect or abrogate vested water rights acquired under state laws seemed to the writer out of harmony with what the language of art. 21 of the contract on its face plainly imported in this connection. See Section 8 of Reclamation Act of June 17, 1902, 32 Stat. 388 and Section 203, Title II, Flood Control Act of June 30, 1948, 62 Stat. 1171; also, Article 32 of Contract under consideration.

On its face, any proviso giving the Secretary the right to ignore and flout the judgment and decree of a court of competent jurisdiction touching the validity of an assessment duly levied by the district impressed the writer as so intolerable and so foreign to elemental concepts of Anglo-Saxon jurisprudence that he has struggled earnestly to find in this article, read in the light of the contract as a whole, some other meaning for the language in question. But that struggle has been in vain. Accordingly, one can only join in the views announced by Mr. Justice McGHEE in holding the questioned language of art. 21 invalid and unenforceable to the extent such language purports to give the Secretary of Interior power to deny water to a water user for failure to pay an assessment adjudged irregular or void by the courts, or whose collection a court may have enjoined because of declared invalidity.

As pointed out in his opinion by Mr. Justice McGHEE, we were able to sustain the contract involved in In re Arch Hurley Conservancy Dist., 52 N.M. 34, 191 P.2d 338, only because in final analysis the Conservancy Court itself had the final say on the validity of assessments following his day in court by the water user.

It follows from what has been said that we would approve the Contract under consideration in all particulars save as to the portion of art. 21 hereinabove discussed. In our opinion the order of reversal should be based solely on the ground that art. 21 is not entitled to approval as to the portion thereof which gives the Secretary power to withhold wa-

ter from a water user for failure to pay an assessment declared irregular or void by a court of competent jurisdiction or as to which collection has been enjoined by any such court.

COMPTON and LUJAN, JJ., concur.

FEDERICI, District Judge (concurring in part and dissenting in part).

I concur in all parts of the opinion of Justice McGHEE except the part in which he holds invalid what he considers the objectionable part of Section 21 of the contract, and that part of the contract placing a limitation on the delivery of water to 160 acres of land. I concur with Chief Justice SADLER wherein he holds in his opinion that the 160 acre limitation is valid. However, I further believe that all of Section 21 of the contract is valid. I am of the opinion the entire Contract is valid; consequently in so far as Justice McGHEE'S opinion and Chief Justice SADLER'S opinion hold any portions of said Contract invalid, I dissent therefrom.

Order Approving Amendatory Contract Submitted by Appellee.

SADLER, Chief Justice.

The appellee, Middle Rio Grande Conservancy District, acting by and through its attorneys, Martin A. Threet and D. A. Mac-pherson, Jr., pursuant to a Motion filed herein on May 28, 1953, to withhold issuance of mandate herein until appellee could submit to this Court an amendatory contract eliminating the objectionable language contained in Section 21 of that certain Contract dated September 24, 1951, between United States of America and Middle Rio Grande Conservancy District, which this Court held illegal and void in its Opinion filed herein May 11, 1953, now having filed herein its document entitled "Presentation of Amendatory Contract for the Consideration of the Court" from which it appears as alleged, that:

"That the United States of America on the 19th day of June, 1953, made, executed and delivered to Appellee an Amendatory Contract between the United States of America and the Middle Rio Grande Conservancy District, eliminating the objectionable language, which has heretofore been held illegal and void by this Honorable Court in its Opinion, herein, dated May 11, 1953, for consideration by the Board of Directors of Appellee, Middle Rio Grande Conservancy District;

"That on June 23, 1953, the Board of Directors of Appellee, Middle Rio Grande Conservancy District, duly approved such Amendatory Contract and authorized its execution by the President of the Board of Directors and

Secretary of the Middle Rio Grande Conservancy District, as shown by a duly certified photostatic copy of such Amendatory Contract, together with a duly executed copy of the Resolution of the Board of Directors of Appellee, Middle Rio Grande Conservancy District, attached hereto, marked Exhibit 'A' and made a part hereof."

And it further appearing from photostatic copy of such Amendatory Contract and a duly executed copy of the Resolution of the Board of Directors of appellee, Middle Rio Grande Conservancy District, attached to said Presentation of Amendatory Contract that United States of America and Middle Rio Grande Conservancy District have amended their existing contract No. 17r–423, dated September 24, 1951, to conform to the opinion of this Court filed herein May 11, 1953, by deleting the objectionable portion of the original contract found in Article 21 thereof reading, as follows:

"Should any assessment or assessments required by the terms of this contract and levied against any tract of land or water user in the District be judicially determined to be irregular or void or the District or its officers be enjoined or restrained from making or collecting any assessments upon such land as provided for herein, then such

tract or water user shall have no right to any of the benefits of this contract and no water made available through the works constructed or rehabilitated by the United States hereunder shall be delivered to or for such tract of land or water user."

But affirming that with the exception of the above deletion said Article 21 and all remaining provisions of the repayment contract dated September 24, 1951, shall remain in full force and effect;

And it further appearing that the said attorneys for appellee have served Hannett and Hannett, attorneys for appellant, with a copy of said document and attached exhibits entitled "Presentation of Amendatory Contract" and that said attorneys for appellant have announced their intention of not further appearing herein and that the cause could proceed to issuance of mandate without further notice to them and the Court being fully advised in the premises and for good cause existing,

It is ordered that said Amendatory Contract be and the same is hereby approved and the objectionable language hereinabove quoted from Article 21 of the contract dated September 24, 1951, above mentioned, is deleted therefrom and the said contract of September 24, 1951, as thus amended by deletion should be and is along with said Amendatory Contract in all respects rati-

fied, approved and confirmed and mandate herein should issue accordingly.

It Is So Ordered.

McGHEE, COMPTON and LUJAN, JJ., and FEDERICI, District Judge, concur.